Your Honor, in this case on the docket 2-15-1197, the people of the state of Illinois, Plaintiff Appellee Lee Packard Steger, Defendant Kellogg, are given all behalf of Plaintiff Appellee Liz Koros. Good morning, Counsel. Ms. Koros. Good morning, Your Honors. I am Vicki Koros from the Office of the State Appellate Defender, here arguing on behalf of the appellant, Mr. Patrick Steger. May it please the Court and Counsel, in this appeal, Mr. Steger is challenging his convictions for felony disorderly conduct and misdemeanor disorderly conduct, and I'd like to address the felony first. Mr. Steger stands convicted of a felony for calling 911 and asking for an officer to facilitate a custody exchange that had already been interrupted two times that day. The record shows that it wasn't uncommon for Mr. Steger to invite the local police to stand by during his custody exchanges with Deborah Einicker, and it was never considered a crime before. The only difference this time is that instead of calling the non-emergency number to invite the police, he called 911. Also, wasn't there a difference this time in that he had a police officer with him when he called 911? There was an officer there, but I would argue that his role was not to be there to facilitate the custody exchange. His role was something different. Well, but he did interact with the child's mother in the defendant's presence, did he not, and sent her home to get the child changed and instructed her to bring the child back for the visitation? That's right. So he was acting in a role to help facilitate the visitation, certainly by those actions, was he not? Well, I would argue that, again, they had a history of calling the police to come and stand by and facilitate these exchanges. But on this particular day, Officer Mode was actually sent to the McDonald's to arrest Mr. Steger. He wasn't there to facilitate the exchange. He was there to actually disrupt the exchange. And once that exchange was disrupted the first time, the officer took it upon himself to then coordinate where the next exchange would happen. But again, even at that time, he wasn't so much – he was acting like the gatekeeper of the exchange and actually stopped the exchange from happening at the sheriff's office again by telling – by not allowing Mr. Steger to take his son and sent Deborah away. Until the child. He didn't want him to take him when he was necessarily wet with all his clothing, correct? That was his reason, correct. Right. And the officer warned him not to call 911, did he not? The officer did. The officer said, I'm already here. We don't have an emergency. You can't call 911. But again, that's not really an accurate statement of when citizens are allowed – or when it's criminal for a citizen to call 911. In order for it to be criminal, there has to be knowing elements. Knowing that you're making a false complaint, knowing that you have no reasonable grounds for making the call, and knowing that it could result in an emergency response. And none of those knowing elements were proved in this case. Under these circumstances, how were the grounds reasonable? The grounds were reasonable because Officer Lute had, in fact, interrupted the exchange two times at that time – by that point. But when the call was made, he was not interrupting or he was not prohibiting the visitation from taking place, was he? He had already – he had, in fact, stopped the visitation twice at that point. First time how? The first time was at the McDonald's. Because he went there to arrest him on a warrant. Right. Knowing that the exchange was going to take place there. But again, interrupting that by instead arresting him and bringing him to the county jail. And the second time at the parking lot of the sheriff's office where, again, everybody was there to exchange the child and then – The child got his pants because he was scared. The child got his pants for – For whatever reason. For whatever reason, right. And again, Mr. Steger had offered, he's my son, I'll take him, I'll change him, I'll take him, you know, we'll go home. But the officer decided to allow Deborah instead to delay the exchange further and have her take him back to the house in order to change and then to bring him back. And by that time, Mr. Steger, I think, reasonably considered this idea that, again, the officer mode was not there to actually let this exchange happen in a timely manner, but was going to allow it on his terms rather than the terms of, you know, what the court had ordered was to say that Friday afternoon, 5 p.m., you're going to collect your son at this designated place. The defendant told the dispatcher that the officer will not let me take my son. Correct. So that's the statement. Yes. The officer testified that he told the defendant, I am going to let you take your son. It's just after he gets changed, correct? Correct. So how is that a true statement? I shouldn't even say that. I mean, even if the defendant somehow believes that that's true, isn't there evidence in the record to support the decision that the defendant made a statement that was false in that by saying the officer isn't going to let me take my son after the officer said I'm going to let you take your son. We're talking about sufficiency of the evidence here. Isn't there evidence of knowledge in the record? No, because, again, it's not whether or not the officer was, in fact, going to allow that to happen. The question is whether when Mr. Steger made that call, he knew whether what he was reporting was false. And at that time, that was not a false statement. Officer mode was not letting him collect his son at that point. So that was a true statement. There was nothing false about what he believed he said to the dispatcher at that time. There is ample testimony that your client was very upset, belligerent, had to be calmed down by this officer. And do you think that perhaps the trier effect took that into consideration in determining the way to be given to his knowledge as to whether or not he was making a false report? I'm not sure. Again, I can't speak to how the trier effect made its decision. What would be a reasonable inference from the trier effect to make that? I think what the trier effect was taking out of his behavior was making a character assessment about him and not really considering whether the elements of the crime were proven beyond a reasonable doubt. At least that's my assessment of this record. But don't we have to read this knowledge of the falseness of the statement together with the requirement of he knew no reasonable ground for there was no reasonable ground for making the call? I mean, you say the visitation had been stopped twice, but then we just talked about what was in the record with regard to the conversation about taking the child home, allowing the wife I'm sorry, the mother, to take the child home, change the child, and then being instructed in the defendant's presence to bring the child back. Right. So how was that reasonable on the defendant's part? Well, because there was no guarantee that that next exchange was actually going to that Mr. Moot, that Officer Moot was going to allow that third exchange to actually happen. But he didn't wait to find out before he called 911. The law doesn't require him to wait to find out. Well, I think I'm sorry. I think, again, the reasonable grounds is that at McDonald's the understanding was, okay, we're going to change, there's going to be a change of situation here. The exchange is happening elsewhere. And he shows up to that point B, and again, the exchange doesn't happen there. And now we're waiting for step C to happen. But, again, the history of what happened during that late afternoon shows that there was no guarantee that Mr. Steger felt that this exchange was even going to happen. That sounds like a great argument that you might make in front of a jury or a judge at a bench trial. We're looking at whether or not there's any evidence in the record upon which a rational fact finder could find that this statement was false. And there's, I mean, I mentioned it before, but there's evidence in the record that the officer told him, you're going to be able to take your son, and then he calls to get the police there to get his son, saying the officer won't let him take his son. So, again, we have a standard of review here. Right. We're not trying to charge a fact. No, absolutely. And I'm certainly not suggesting that this court re-weigh the evidence. Again, the standard is, you know, even in light of looking at the evidence in light of what's favorable to the state, whether the case was proven beyond a reasonable doubt. And I'm saying that the jury got it wrong this time. I believe that their decision was based on something else than the facts and the statute and applying those facts to the statute and determining whether or not there was all the essential elements of the crime were met in this case, considering all the facts. The second part of your argument is that whether an emergency response could result from the call. Yes. Let's assume for a minute that that's a false statement. Do you think it's enough to call 911 and say, this isn't an emergency call, just to blurt out, this is not an emergency call, I'm not expecting an emergency response? Do you think that's enough to bypass the statute? I think in this case, yes. I think in that case. I'm talking in general. You think any time somebody calls 911, makes a false report, I just witnessed a bank robbery. But let me just tell you, this is not an emergency call, okay? This is an emergency. Or whatever they're going to say. Right. Whatever false statement they're going to say. Maybe nothing so extreme as a bank robbery. But by stating, this is not an emergency, I do not expect an emergency response to come, that's enough to insulate someone from a felony offense. No, because you just said that they were caught making a false report. So that takes out one of the elements. You're making two separate arguments. You're making them together, but I understand. But there are two separate arguments. One is he didn't know. It's challenging every element of the statute, yes. One of the elements is, I'm saying assume for a minute that that is a false statement. That there's enough evidence in the record for a jury to find that's a false statement. Is it enough to say, to insulate yourself from a felony offense to say, I do not expect an emergency response? That's a great question. I believe that under those circumstances, the state would have a hard time proving that the defendant called 911, knowing that an emergency response could be dispatched to the area. So I would argue that in that case, if you're alerting the dispatcher that this is not an emergency, I don't know what other number to call, and I'm reporting this offense, then that element of the crime has not been sufficiently proved. And again, in this case, we have not only Mr. Seeger alerting the dispatcher, again, the 911 reporting itself. I apologize if this isn't the right number. I have no means to find a non-emergency number right now. Again, the first thing he did was alert the dispatcher that this is not an emergency situation. He testified that, I wasn't expecting an emergency response. I just wanted an officer there to help me get my son. And also another factor is that the dispatcher herself didn't treat the call as an emergency response. Well, he didn't ask for the non-emergency number either. He didn't say, I'm not going to bother you further. I know the emergency number here. I'm not going to take up your time. What is the correct number to call? He didn't ask that either. He did ask for the state police number. By that point, he was asking. But he didn't ask for the non-emergency number. Well, at this point, he threatened to go to the state police. He asked for the state police number. And the dispatcher was like, well, I can give it to you. But they're not coming out either. So there was – so he made an effort to try to, like, to, you know, again, explain this is an emergency. I'm just looking for help outside this county because I – there seems to be this – you know, the county is not showing me the kind of help that I need in this situation that I've gotten before by making these calls. So, you know, he asked for the state police number. And she's like, I can give it to you, but they're not coming. And he says, okay, well, goodbye then. And then he – Were the state police the ones that would facilitate the visitation? I'm not certain. I know that multiple law enforcement agencies had been part of these exchanges in the past. But I don't know that the state police had ever participated in these. Another – you know, again, there's a reason why he was also calling 911. He explained that, you know, his smartphone was back in his car at the McDonald's parking lot in Genoa. When he was arrested, everything was left there, and he was brought over to the DeKalb County Jail. The only phone he had with him was his non-split phone, which was incapable of Googling the DeKalb County Sheriff's non-emergency number. And this is why he ended up calling 911. Again, these are actions that he's taken before. He's invited the police to be there before. The only reason it's a crime now is because he mistakenly called 911 instead of having the DeKalb County Sheriff's Office non-emergency number memorized. And again, with all those, I don't believe the knowing elements of the crime were proven beyond a reasonable doubt in this case. I would like to talk next about – let's see. And again, the call, no matter how misguided or ill-advised, is simply not a crime in this case. So we'd ask a reversal on that conviction. The next conviction was for the misdemeanor disorderly conduct. And again, in this case, we ask that you reverse the conviction because the state failed to prove that his conduct was unreasonable or provoked a breach of the peace.  He stayed from Deborah Inika's house for about two or five minutes. That's it. He was just standing outside. He didn't knock on her door. He didn't yell, gesture, do anything. He didn't even know whether anybody was looking out from their window to see him. So we have to look not only at the conduct, however, but the surrounding circumstances. Absolutely. And the surrounding circumstances include the fact that he was arrested for conduct that had previously taken place with regard to a prior visitation and the mother's fiancé or then husband. Isn't that correct? That's correct. That's part of the surrounding circumstances and all that had taken place a short time before. That's absolutely true. And there is that contentious relationship in general that they had. But at the same time, he didn't drive to her house and camp out there on his own accord. He walked there on his way to me. May I have a moment to answer that? Yes. Again, Deborah's house and the county jail are actually on the same busy street. He had called his parents to pick him up, and he knew that they would be on that street. So he decided to walk north to try to meet his parents. And at some point, like a mile, he decides to take a break. Ironically, in front of her home. Again, that's an issue that's definitely worth questioning. But at the same time, it's not relevant to deciding on appeal whether his conduct was reasonable or whether his conduct provoked a breach of the peace. It's absolutely relevant. You're supposed to look at all the facts and circumstances. And Deborah testified that the exchanges were not allowed to take place at her house. I don't know why, but she just said that's what her testimony was. So he's apparently not allowed to go there to get the child. And he walks a mile to get to the house and then gets fired right in front of the house and stands out there for approximately five minutes. Right. That may show bad judgment, but that doesn't show – I don't believe you haven't shown that that's criminal judgment. Well, the issue is not whether it was bad judgment. It's with how did it make them feel? How did it make her feel? And do you need to have overt threats or profanity, abusive language in order to equal disorderly conduct? Right. You don't need language or any kind of threats. But at the same time, there has to be, I think, more than just standing outside for two minutes and not without any other action at all. Again, he's – you know, again, it's not in the middle of winter. It's not in the middle of the night. It's on a Friday afternoon in August when it's still daylight. He's, you know, walking up the street to meet his parents. In fact, his parents do pass by and miss him. And he ends up – there's a neighbor outside that he has to borrow the phone to call his parents to make different arrangements for his pickup. The neighbor who's outside was undisturbed by the fact that he was just outside standing in front of her house, in fact. Well, the neighbor had not experienced what had just happened with regard to the arrest and the misvisitation exchange and the defendant's anger and ire and uncontrolled behavior. So it's certainly reasonable that the neighbor wouldn't have been alarmed and disturbed. And that's why I believe that the fact that the neighbor was undisturbed goes to the fact of whether or not this provoked a breach of the peace or not. But does alarmment – is definitely a – is only one of the factors you need to prove disorderly conduct in this case. But again, you don't have to have any threats. You don't have to have any abuse of language, profanity, carrying on in order to have a breach of the peace. The surrounding circumstances, the unique circumstances, if you will, in this situation, would that not be enough to provoke the breach? Like here's this man who's not supposed to be near her, standing outside of her house, staring at her house, leaning against a pole with his hands behind his head, standing there for no reason. Again, I believe the record does show what his reason is. Again, they're on the same street. He doesn't have a smartphone. He can't calibrate a different route that his parents can meet him at. 23 is the major street that goes in and out. He's going to be on there in order to find his parents. So again, I think there's some reason why he's on that street. And again, there's no evidence of any intent for him to try to, like, annoy her or disturb her. He is – there's no evidence of him even knowing that she's looking out of a window to see him. He's out there waiting for his parents, and that's his testimony. And again, I don't see how just standing outside, even in the context of having been arrested and their tumultuous relationship, that that suggests that that was unreasonable. So again, I thank you for your time, and we ask that both convictions be reversed. Thank you. Ms. Moy. May it please the Court. Good morning, Your Honors. Good morning. My name is Cora Moy. I'm CAP of the People. I would like to first address the felony, and then I'll address the misdemeanor. It was not irrational for the jury to find the defendant guilty of both charges. In regards to the felony disorderly conduct, the defendant knowingly did call to make a false complaint. And the defendant called 911 and alleged that the officer was not letting him collect his son. He was requesting another officer who was willing to do his job. What about the effect of the defendant's apology when he called 911 and telling the dispatcher that this wasn't an emergency? I don't believe it has any bearing on that language. I think it's more about the substance of his request. And what he's requesting here is another officer on the scene, which I'm going to jump to the third element, that he is requesting an emergency response. By asking for another officer who is a first responder type of person, such as a firefighter or an ambulance, by requesting an officer to come to the scene is arguably requesting an emergency response. So the substance of what he's asking for is asking for another cop to come out onto the scene. And here, there is already a cop on the scene. And when the defendant tells the officer that he is going to call 911, the officer tells him that it's unreasonable. I am here. I am attempting to facilitate this custody exchange. And it is while the defendant argues that the officer had other intentions, the officer does testify that his duty that day was to help facilitate this exchange. And on that point, I would like to go back to the delays that the defendant alludes to. The first delay is that the defendant was arrested. There was an outstanding warrant for the defendant's arrest. The officer was doing his job as a police officer by effectuating an arrest based off of this warrant. Even then, the record shows that the officer was still attempting to facilitate the exchange. All the parties had an understanding that there was still a custody exchange to occur. And the officer took the defendant to the bank to help him get money for the bond. And I think this shows that the officer is trying to, I guess, make the process a little bit more smoothly so that way he could get out of jail and post bond money. The second delay... Does that go to the reasonableness of the defendant's belief, then? Given the prior action of the police officer, that is, right after the arrest, taking him to the bank so that he could bond out of jail and actually then be available for the visitation? I would argue that it does. But more so, I think, for the second delay that the defendant alleges, that the officer didn't allow to take the child after he wet himself. I think when we look at when the 911 call was made, this was after the child wet himself. This was after they had all left the police station. And this was when the defendant was driving to the child's mother's house while she was trying to get the sound exchange. The defendant didn't wait at the police station for the child to return, as the officer told him. The officer kept the defendant apprised of what was going on. The officer told him that when... I'm sorry. Let me go back a little bit. When the officer initially went back to the station and was talking to the defendant's mother, this was before the defendant arrived at the police station, when the defendant arrives, the officer tells him, and this is on the record page, I believe 808, that the mother of the child is on her way with the child to do the custody exchange. The officer is updating the defendant about where the child is and when this custody exchange could happen. After the child wets himself, I believe that the officer does tell the defendant that they will return with the child after the child has been cleaned up. Therefore, when he calls 911, and this is after all of this has happened, when he calls 911 to say that the officer is not helping him facilitate the exchange, it's against the weight of the evidence that's in the record. And again, the unreasonable grounds at the time the call was made, I think that goes to the fact that the officer told the defendant that it would be unlawful for him to call because he was already on the scene. Now, it would not have been unlawful for him to call the non-emergency number to ask for assistance, correct? Correct. And the first thing you said was, I can't find the non-emergency number, basically alerting everyone to the fact that this was not an emergency call, and the dispatcher didn't treat it as an emergency, correct? Regardless of whether or not the dispatcher treated it as an emergency call, I think it doesn't matter how the dispatcher treated the call. Again, looking at the substance of what the defendant is requesting, he is requesting an emergency response by requesting that an officer come to the scene. In requesting that, in requesting a first responder type of response, I would list to the factor of the emergency response. I hope that answered your question. Turning to the second charge for the misdemeanor disorderly conduct, I'm sorry, one last point on the first issue. I think the defendant mentioned that he would take the child home to clean up the child. However, I believe in the record, the defendant lives in Algonquin. When the mother lives in DeKalb, or I'm sorry, Sycamore, if the child is wet, I'm sure the child is uncomfortable. It would make more sense that the child goes home with the mother to get cleaned up before the custody exchange is completed. Moving to the second charge of the misdemeanor disorderly conduct, the act of standing outside after, as I believe Justice Zinoff mentioned, in light of the circumstances of what happened that day, the defendant was arrested for making the threats prior to this whole entire custody exchange. The whole purpose of this disorderly charge is that it guards against the invasion of the right of others not to be molested or harassed, either mentally or physically, without justification. Here, by standing outside of a home, it was unreasonable. The exchanges don't usually happen at McDonald's. It doesn't happen at any of the parties' homes. What warrant had he just been arrested on? It was for another case. What was the crux of that other case? The crux of the case is that the defendant made threats. I believe he was going to rip the husband of the baby's mother's arm off in court. That was the basis of the charge. So he had just been charged or just been arrested on that warrant, and within the hour, he was standing in front of their home, correct? Correct. And so this situation, and at this time, the defendant does know that that was an underlying reason, and that's on Record Page 869. Arguably, when the defendant is leaving behind a stop sign with his hands intertwined behind his head with his legs crossed in front of him, arguably this stance is of a taunting or provoking nature. I think a reasonable inference is that you can't make me move, or it's meant to upset the child's mother and her husband. Let's assume for a minute it's meant to upset the child's mother. Let's assume for a minute that the child's mother is alarmed and disturbed. How does one provoke a breach of peace by standing leaning against the sign? Again, I think for this charge you have to look at the surrounding circumstances, and while it wasn't an overt act of some of the other cases where someone's screaming or waving papers, it's not something overt, but this is something that is still breaching her peace and her right to not be harassed either mentally or physically. And his action of standing outside her home is breaching her peace, they both testified that, I'm sorry, Debra and he testified that his standing there really freaked her out, and she didn't know what he was there for, and that's on record page 750. The defendant, I'm sorry, the defendant, the Mark Dorsett also testified that he was scared, and I believe that's on page 780 of the record. His conduct alarmed her so much that she felt the need to call an emergency line and ask what was going on. And again, these parties all knew that an exchange was going to happen. There had been no contact between any of the parties involved when the exchange was going to happen. So by the child's mother seeing, after seeing the defendant arrested, and then not having any knowledge of why or when he got out from jail, all of a sudden standing outside the home, this alarmed her and caused deep breach of peace. So if there aren't any more questions. Thank you very much. The state requests that you refer him to the defendant's convictions. Thank you. Thank you. Ms. Gross? Nothing further. Okay. Thank you very much, counsel. Thank you both for your arguments this morning. The Court will take the matter under advisement and render a decision in due course.  Thank you. Thank you.